**KILPATRICK TOWNSEND &**
**STOCKTON LLP**
Frederick L. Whitmer (FW-8888)

The Grace Building
1114 Avenue of the Americas
New York, NY, USA 10036-7703
Telephone: (212) 775 8700
Facsimile: (212) 775 8800

Wab Kadaba (Georgia Bar No. 405727)
Mitch Stockwell (Georgia Bar No. 682912)
Richard Goldstucker (Georgia Bar No. 940472)

1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Attorneys for Plaintiffs Sanford L.P.* (d/b/a DYMO) and DYMO B.V.B.A.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SANFORD L.P. (d/b/a DYMO),<br><br>DYMO B.V.B.A. and<br><br>NEWELL RUBBERMAID, INC.<br><br>       Plaintiffs,<br><br>   v.<br><br>ESSELTE AB,<br><br>ESSELTE LEITZ GMBH & CO. KG,<br><br>ESSELTE CORPORATION<br><br>and<br><br>DAVID BLOCK,<br><br>       Defendants. | 14 Civ.07616-VSB<br><br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Sanford L.P., DYMO B.V.B.A. and Newell Rubbermaid, Inc., by and through undersigned counsel, make and file this First Amended Complaint against Defendants Esselte AB, Esselte Leitz GmbH & Co., KG, Esselte Corporation (collectively, "Esselte" or "Defendants"), and David Block, and hereby allege and demand a jury trial as follows:

## NATURE OF THE ACTION

1.      This action seeks damages and injunctive relief for Defendants' acts of making, using, selling, offering for sale and/or importing Leitz Icon printers that infringe Plaintiffs' U.S. Patent Numbers 5,826,995, 6,152,623, 6,890,113, 7,140,791, and 7,990,567 (collectively, "Asserted Patents"). A true and correct copy of each of the Asserted Patents is attached as Exhibits 1 through 5. This action further arises from Esselte's breach of the plain and unambiguous terms of the July 28, 2005 Stock Purchase Agreement ("SPA"), Mr. Block's breach of his separation agreement and Defendants' interference with contractual relations.

## THE PARTIES

2.      Plaintiff Sanford L.P. ("Sanford") is an Illinois limited partnership with its principal place of business at 3500 Lacey Road, Downers Grove, Illinois 60515. Sanford does business as DYMO and operates the DYMO business, which is in the business of designing, developing, manufacturing, distributing, servicing, selling, marketing and supplying labeling printers, label makers, label embossers and related consumables.

3.      Plaintiff DYMO B.V.B.A. ("DYMO") is a Belgian closed limited liability company located at Industriepark-Noord 30, Sint-Niklaas, Belgium. DYMO is also in the business of designing, developing, manufacturing, and distributing labeling printers, label makers, label embossers and related consumables and each of Sanford and DYMO work together in enhancing that business.

1

4.    Plaintiffs are each wholly-owned subsidiaries of Plaintiff Newell Rubbermaid, Inc. ("Newell"), a Georgia corporation with its principal place of business located at Three Glenlake Parkway, Atlanta, Georgia 30328.  In this Complaint, Newell and its subsidiaries, including Sanford and DYMO, are referred to as the "Newell Companies."

5.    Defendant Esselte AB is a Swedish corporation with its principal place of business located at Sundbybergsvägen 1, 171 73 Solna, Sweden.

6.    Defendant Esselte Leitz GmbH & Co. KG is a German partnership with its principal place of business located in Stuttgart, Germany.

7.    Defendant Esselte Corporation is an Arizona company with an address of 8465 N. 90th Street Pima Center, Suite 6 Scottsdale, AZ 85258.  Esselte Corporation can be served through National Registered Agents Inc., 2390 Camelback Rd, Phoenix, AZ 85016.

8.    Esselte Corporation and Esselte Leitz GmbH & Co., KG are each wholly-owned subsidiaries of Esselte AB.  Esselte AB, Esselte Leitz GmbH & Co., KG and Esselte Corporation are collectively referred to as "Esselte."

9.    Defendant David Block ("Block") is a California citizen, with his residence at 7145 View Avenue, El Cerrito, CA 94530.  Mr. Block currently is employed by Esselte.

10.    This Court has jurisdiction over Mr. Block because Mr. Block improperly disclosed and used Plaintiffs' confidential information within the State of New York in connection with his work for and on behalf of Esselte.

## FACTUAL BACKGROUND

11.    Prior to 2005, Esselte AB owned DYMO AB, a corporation organized under the laws of the Kingdom of Sweden, as well as Esselte Holdings, Inc., a Delaware corporation and Esselte BVBA, a corporation organized under the laws of the Kingdom of Belgium.

2

12.     DYMO AB, Esselte Holdings, Inc. and Esselte BVBA (collectively, "the Companies") were in the business of designing, developing, manufacturing, distributing, servicing, selling, marketing and supplying labeling printers, label makers, label embossers and related consumables.

13.     On July 28, 2005, Newell on behalf of itself and its affiliates entered into a Stock Purchase Agreement ("SPA") with Esselte AB and purchased the Companies -- DYMO AB, Esselte Holdings, Inc. and Esselte BVBA -- for approximately $730 million.  Esselte BVBA was an earlier name of Plaintiff DYMO.

14.     The Companies, as well as Esselte Corporation and DYMO Corporation, owned various intellectual property that, pursuant to the SPA, was to be assigned and transferred in connection with the sale of the Companies and their business to Newell.

15.     U.S. Patent Numbers 5,826,995, 6,152,623, 6,890,113, 7,140,791, and 7,990,567 and/or the patent applications leading thereto were among the patent rights originally owned by the Companies and thus transferred to the Newell Companies pursuant to the SPA.

16.     Various employees of the Companies were inventors of the Asserted Patents, including David Block, who was an inventor of U.S. Patent Number 6,890,113.  After the SPA, Mr. Block and other employees of the Companies, including Philip J. Damiano, Kris Vandermeulen and Tom De Fruytier remained employed with one or more of the Companies after Newell purchased the Companies and those Companies became affiliates or divisions of the Newell Companies.

17.     Before the SPA was executed in 2005, Mr. Damiano had acted as President of the DYMO division of Esselte.  After the SPA, Newell retained Mr. Damiano as the President and General Manager of the Newell Companies' DYMO division until his separation in 2008.

18.     Before the SPA was executed in 2005, Mr. Block worked as the Vice President and Chief Technology Officer for DYMO Corporation. After the SPA, Mr. Block became Vice President of Research and Development and Technology for the Newell Companies' DYMO division until his separation in 2011.

19.     Before the SPA was executed in 2005, Mr. Vandermeulen acted as a design engineer for Esselte thermal printers and consumables. After the SPA, Mr. Vandermeulen likewise remained employed by the Newell Companies' DYMO division, eventually becoming a senior manager for global research and development of DYMO products before his separation in 2012. During his employment, Mr. Vandermeulen was named as one of several inventors on patent rights which he assigned to one or more of the Newell Companies.

20.     Before the SPA was executed in 2005, Mr. De Fruytier acted as an international marketing manager for the DYMO LabelWriter product category. After the SPA, Mr. De Fruytier likewise remained employed by the Newell Companies' DYMO division as a senior marketing manager from immediately after the SPA until his separation in 2012.

21.     While at the Newell Companies' DYMO division, each of the above-identified employees remained involved in DYMO's business of designing, making and selling label printers and related materials.

22.     In 2012, Esselte hired Mr. Damiano as the President of New Business Development. Likewise, in 2012, Esselte hired Mr. Block as Vice President of Product Development. In 2012, Esselte hired Mr. Vandermeulen as an engineer. At least by 2014, Esselte hired Mr. De Fruytier as a marketing category manager. Esselte assigned each of these employees to designing, developing, and marketing a printer and related products that would compete with DYMO's business.

23.     Some of the re-hired employees sought to conceal their new employment.  For instance, Mr. Vandermeulen had, by virtue of his prior employment with the Newell Companies, obligations to execute papers associated with patent applications.  When questioned about his current employment, he informed Newell personnel he was not working for Esselte, only to be contradicted when Esselte's human resource department later informed Newell personnel that Esselte had, in fact, hired Mr. Vandermeulen.

24.     In February, 2014, Mr. Block, as Vice President, filed an initially confidential, application for the Leitz Icon printer on behalf of Esselte Leitz GmbH & Co. KG with the Federal Communications Commission ("FCC") to obtain authorization for marketing the Leitz Icon printer.  The draft user manual associated with this application included comments indicating that additional material was needed from "Kris," which, on information and belief, was a reference to Kris Vandermeulen.  In any event, the FCC ultimately issued a non-transferable equipment authorization to Esselte Leitz GmbH & Co. KG, the manufacturer or importer of the Leitz Icon printer and only later released the application materials for public review.

25.     Sometime in the Spring of 2014, Defendants announced the launch of the Leitz Icon Printer.  A true and correct copy of the Leitz Icon Printer user Guide is attached hereto as Exhibit 7 and fully incorporated herein.  Page 6 of the user guide reads:

The Leitz Icon printer is the heart of your Icon Smart Labeling System. Using the printer, you can print a wide variety of labels, name and visitor badges, and more. Because the printer can cut labels to size, you can use a single label cartridge to print many different types of labels, minimizing the need to switch cartridges. When you do need to change cartridges, you have a choice of paper or plastic self-adhesive labels, as well as non-adhesive card stock. All label types are available in multiple widths to meet a variety of applications.

The printer connects to your computer wirelessly or using the included USB cable. You can also print labels from your iPad using the Leitz Icon app or print remotely using Google Cloud Print.



Getting to Know the Printer



26.     The Leitz Icon Printer utilizes an Intelligent Label Cartridge described on page 7:

Getting to Know the Intelligent Label Cartridge

Leitz Icon Intelligent Label Cartridges are easy to load into the printer and are recyclable*. Each cartridge has a folding label guide that opens to load and print labels and closes to protect labels during storage. The Intelligent Label Cartridge uses a special cartridge identification chip to relay information about the label cartridge, such as the type and size of the label, the capacity of the label cartridge, and the number of labels remaining, to the software.

NOTE  Avoid handling the cartridge identification chip as this may damage the chip. If the chip becomes damaged, the label cartridge may not work properly.



27.     The Leitz Icon Printer further includes software that is used to design and print labels via, among other things, a wireless connection.

6

28.     Messrs. Damiano, Block, Vandermeulen and De Fruytier were aware that the Newell Companies' DYMO division had multiple patents, including the Asserted Patents, that covered various aspects of label printers, including label printers made, imported, used or sold by Newell's DYMO division.

29.     Esselte AB, Esselte Leitz GmbH & Co. KG and Esselte Corporation were likewise each aware that the Newell Companies' DYMO division had multiple patents, including the Asserted Patents, that covered various aspects of label printers, including the label printers made, used and sold by Newell's DYMO division.

30.     Esselte AB specifically represented within the SPA, with Esselte Leitz GmbH & Co. KG and Esselte Corporation's knowledge, consent and cooperation, that the patents, including the Asserted Patents, conveyed under the SPA were valid and binding.

31.     Esselte AB specifically represented within the SPA, with Esselte Leitz GmbH & Co. KG and Esselte Corporation's knowledge, consent and cooperation, that the assigned patents, including the Asserted Patents, were used in the conduct of the business Newell purchased, namely, the business of designing, developing, manufacturing, distributing, servicing, selling, marketing and supplying labeling printers, label makers, label embossers and related consumables.

32.     The Leitz Icon Printer, software and consumables are marketed through the same channels and to the same consumers as Newell's DYMO printers, software and consumables.

33.     Despite their express knowledge of and familiarity with the Asserted Patents, Defendants re-hired or caused to be re-hired former personnel employed by the Newell Companies that had express knowledge of the Asserted Patents.

34.     Defendants have designed, developed and marketed the Leitz Icon printer to compete with the Newell Companies' DYMO division and its products.

35.     Defendants have made, imported, used, offered for sale and sold the Leitz Icon printer and associated software and consumables that are covered by, and infringe, the Asserted Patents, including the very patents sold to the Newell Companies by Esselte pursuant to the SPA.

## JURISDICTION AND VENUE

36.     This action arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, including 35 U.S.C. § 271, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §1331 and §1338(a).

37.     Esselte AB, by and through its wholly-owned subsidiaries and agents, Esselte Corporation and Esselte Leitz GmbH & Co. KG, has caused the manufacture, importation, offer for sale, sale and use within the United States and this judicial district of the Leitz Icon printer, related software and consumables.

38.     Esselte Leitz GmbH & Co. KG is the manufacturer or importer of the Leitz Icon printer. Esselte Leitz GmbH & Co. KG additionally operates and maintains a website through which users within the United States and this judicial district may download software and firmware for using the infringing Leitz Icon printer. Esselte Corporation likewise offers, to users within the United States and this judicial district, software for using the infringing Leitz Icon printer.

39.     Esselte Leitz GmbH & Co. KG, doing business as "Leitz America," and Esselte Corporation, each offer users instructional videos within the United States and this judicial district for potential or actual purchasers of infringing Leitz Icon printers, related software and consumables.

8

40.     Esselte Leitz GmbH & Co. KG, doing business as "Leitz America," and Esselte Corporation, each offer for sale and sell within the United States and this judicial district the infringing Leitz Icon printer and related software and consumables.

41.     Each of the Defendants is present within or has minimum contacts with the State of New York and the Southern District of New York, and each has purposefully availed itself of the privileges of conducting business in the State of New York and in the Southern District of New York.  Each Defendant has sought protection and benefit from the laws of the State of New York and regularly conducts business within the State of New York and within the Southern District of New York, and Plaintiffs' causes of action arise from Defendants' business contacts and other activities in the State of New York and in the Southern District of New York.

42.     Each Defendant, directly and/or through its authorized agents, imports, distributes, offers for sale, sells, and/or advertises products and services in the United States, the State of New York, and the Southern District of New York including but not limited to the Leitz Icon printer.  Each Defendant solicits, directly or through intermediaries, customers in the State of New York and in the Southern District of New York and has paying customers who are residents of the State of New York and the Southern District of New York and who use the Leitz Icon printer and related consumables and software in the State of New York and in the Southern District of New York.

43.     Further, pursuant to the SPA, Defendant Esselte AB consented to submit to exclusive jurisdiction and venue in any federal court located in the State of New York, including this Court, as to any actions arising out of or relating to the SPA or the transactions therein. Esselte AB's wholly-owned subsidiaries and agents, Esselte Corporation and Esselte Leitz GmbH & Co. KG, each are in privity with or controlled by Esselte AB and/or were transaction

participants in connection with the SPA. Esselte Corporation and Esselte Leitz GmbH & Co. KG each are accordingly bound by the jurisdiction and venue clause in the SPA. As the causes of action at issue involve the very patent rights transferred under the SPA by Esselte AB and its subsidiaries to the Newell Companies, Plaintiffs now bring this action for patent infringement in this Court.

## COUNT ONE
## WILLFUL INFRINGEMENT OF U.S. PATENT NO. 5,826,995

44.     Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

45.     U.S. Patent Number 5,826,995 ("the '995 Patent") is entitled "Cassette for a Thermal Printer." The '995 Patent was duly and legally issued on October 27, 1998 by the United States Patent and Trademark Office. A true and correct copy of the '995 Patent is attached hereto as Exhibit 2.

46.     DYMO is the owner of the '995 Patent. Sanford is the exclusive licensee of the '995 Patent and possesses all rights of recovery under the '995 Patent, including the exclusive right to sue for infringement and recover past damages.

47.     The '995 Patent provides, among other things, "a tape holding case for a thermal printer, said tape holding case holding at least a supply of image receiving tape and having an outlet through which the image receiving tape can be fed out, the tape holding case having a wall portion adjacent the outlet, wherein the wall portion is configured and dimensioned to cooperate with an output roller of a printing device into which the tape holding case is inserted, with the wall portion and roller both contacting the tape so that rotation of the roller slides the tape against the wall portion to feed the tape out of the tape holding case."

48.     Each Defendant has infringed one or more claims of the '995 Patent, and continues to infringe, contribute to infringement of, and/or induce infringement of the '995 Patent, by making, using, selling, offering for sale, and/or importing the Leitz Icon Printer and its Intelligent Label Cartridge, in violation of 35 U.S.C. § 271.

49.     Each Defendant also has infringed under 35 U.S.C. § 271(b) and (c) by inducing and/or contributing to infringement of the '995 Patent in the State of New York, literally or under the doctrine of equivalents, in this judicial district, and elsewhere in the United States, by, among other things, performing certain steps of the methods and systems claimed by the '995 Patent, and advising, encouraging, contributing, or otherwise inducing others to perform the remaining steps claimed by the '995 Patent to the injury of DYMO and Sanford.

50.     Each of the Defendants, as the original owner or affiliate of the original assignee of the '995 Patent had knowledge of the '995 Patent since its filing and issue date, and by committing the actions described above, had specific intent to induce infringement of the '995 Patent pursuant to 35 U.S.C. § 271(b).

51.     Each of the Defendants has willfully and intentionally infringed upon the '995 Patent without authority and/or license from Plaintiffs DYMO and Sanford.

52.     Plaintiffs DYMO and Sanford are entitled to recover from each Defendant the damages sustained as a result of each Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT TWO
## WILLFUL INFRINGEMENT OF U.S. PATENT NO. 6,152,623

53.     Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

54.     U.S. Patent Number 6,152,623 ("the '623 Patent") is entitled "Tape Printing Apparatus and Tape Holding Cases." The '623 Patent was duly and legally issued on November 28, 2000 by the United States Patent and Trademark Office. A true and correct copy of the '623 Patent is attached hereto as Exhibit 3.

55.     DYMO is the owner of the '995 Patent. Sanford is the exclusive licensee of the '995 Patent and possesses all rights of recovery under the '995 Patent, including the exclusive right to sue for infringement and recover past damages.

56.     The '623 Patent provides, among other things, "a tape holding case for use with a tape printing apparatus having a print head for printing an image on an image receiving tape, and a surface, said print head and said surface having a first printing position in which said print head acts against said surface and a second non-printing position in which said print head and said surface are spaced apart, said tape holding case housing a supply of image receiving tape and having an interaction portion for separating the print head and the surface so that the print head and the surface are in the second position during insertion of the tape holding case in the tape printing apparatus, said interaction portion being arranged so that the print head and said surface are in the first position when the tape holding case is received in said tape printing apparatus."

57.     Each Defendant has infringed one or more claims of the '623 Patent, and continues to infringe, contribute to infringement of, and/or induce infringement of the '623 Patent, by making, using, selling, offering for sale, and/or importing the Leitz Icon Printer and its Intelligent Label Cartridge, in violation of 35 U.S.C. § 271.

58.     Each Defendant also infringes under 35 U.S.C. § 271(b) and (c) by inducing and/or contributing to infringement of the '623 Patent in the State of New York, literally or under the doctrine of equivalents, in this judicial district, and elsewhere in the United States, by,

among other things, performing certain steps of the methods and systems claimed by the '623 Patent, and advising, encouraging, contributing, or otherwise inducing others to perform the remaining steps claimed by the '623 Patent to the injury of Sanford.

59.     Each of the Defendants, as the original owner or affiliate of the original assignee of the '623 Patent has had knowledge of the '623 Patent since its filing and issue date, and by continuing the actions described above, has had specific intent to induce infringement of the '623 Patent pursuant to 35 U.S.C. § 271(b).

60.     Each of the Defendants is willfully and intentionally infringing the '623 Patent without authority and/or license from DYMO and Sanford. Defendants' infringement has damaged and irreparably harmed Plaintiffs.  Each Defendant's infringement of Plaintiffs rights will continue to damage Plaintiff, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

61.     Plaintiffs DYMO and Sanford are entitled to recover from each Defendant the damages sustained as a result of each Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT THREE
## WILLFUL INFRINGEMENT OF U.S. PATENT NO. 6,890,113

62.     Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

63.     U.S. Patent Number 6,890,113 ("the '113 Patent") is entitled "Tape Printers." The '113 Patent was duly and legally issued on May 10, 2005 by the United States Patent and Trademark Office, based on an application listing David Block as a named inventor.  A true and correct copy of the '113 Patent is attached hereto as Exhibit 4.  Mr. Block assigned all right, title

and interest in the '113 Patent to Esselte N.V. (which was the former name of DYMO B.V.B.A.) pursuant to the true and correct copy of the assignment attached as Exhibit 8.

64.     DYMO is the owner of the '113 Patent.  Sanford is the exclusive licensee of the '113 Patent and possesses all rights of recovery under the '113 Patent, including the exclusive right to sue for infringement and recover past damages.

65.     The '113 Patent provides, among other things, "a method for printing an image on an image receiving tape comprising the steps of receiving data containing information for a plurality of individual labels, processing said data to identify a plurality of individual label data fields to be printed on said plurality of individual labels, generating a plurality of individual labels from the identified data, and printing said plurality of individual labels."

66.     Each Defendant has infringed one or more claims of the '113 Patent, and continues to infringe, contribute to infringement of, and/or induce infringement of the '113 Patent, by making, using, selling, offering for sale, and/or importing the Leitz Icon Printer and its Intelligent Label Cartridge, in violation of 35 U.S.C. § 271.

67.     Each Defendant also infringes under 35 U.S.C. § 271(b) and (c) by inducing and/or contributing to infringement of the '113 Patent in the State of New York, literally or under the doctrine of equivalents, in this judicial district, and elsewhere in the United States, by, among other things, performing certain steps of the methods and systems claimed by the '113 Patent, and advising, encouraging, contributing, or otherwise inducing others to perform the remaining steps claimed by the '113 Patent to the injury of Sanford.

68.     Each of the Defendants, as the original owner or affiliate of the original assignee of the '113 Patent has had knowledge of the '113 Patent since its filing and issue date, and by

continuing the actions described above, has had specific intent to induce infringement of the '113 Patent pursuant to 35 U.S.C. § 271(b).

69.     Each of the Defendants is willfully and intentionally infringing the '113 Patent without authority and/or license from Plaintiffs DYMO and Sanford. Defendants' infringement has damaged and irreparably harmed Plaintiffs DYMO and Sanford.   Each Defendant's infringement of DYMO and Sanford's rights will continue to damage Plaintiffs DYMO and Sanford, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

70.     Plaintiffs DYMO and Sanford are entitled to recover from each Defendant the damages sustained as a result of each Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT FOUR**
**WILLFUL INFRINGEMENT OF U.S. PATENT NO. 7,140,791**

71.     Sanford realleges and incorporates by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

72.     U.S. Patent Number 7,140,791 ("the '791 Patent") is entitled "Vertical Autosizing Printing System."   The '791 Patent was based on U.S. patent application No. 10/975,409, that was sold to Newell via the SPA. The '791 Patent was duly and legally issued on November 28, 2006 by the United States Patent and Trademark Office.   A true and correct copy of the '791 Patent is attached hereto as Exhibit 5.

73.     Sanford is the owner by assignment of the '791 Patent and possesses all rights of recovery under the '791 Patent, including the exclusive right to sue for infringement and recover past damages.

15

74.     The '791 Patent provides, among other things, "a method for printing an image on an elongate image receiving medium comprising the steps: inputting data defining the image to be printed; selecting a vertical printing mode in which the image is to be printed across the width of the elongate image receiving medium; initiating a print operation for printing the image; generating print data, in accordance with a print data generation method which ensures that the image fits in the width of the elongate receiving medium, wherein the print data generation method comprises the steps of calculating a length of the image with a first character size and comparing said length to at least two predetermined ranges, each of said predetermined ranges being associated with a predetermined character size; and printing the image with the predetermined character size corresponding to the range in which said calculated length is situated."

75.     Each Defendant has infringed one or more claims of the '791 Patent, and continues to infringe, contribute to infringement of, and/or induce infringement of the '791 Patent, by making, using, selling, offering for sale, and/or importing the Leitz Icon Printer and its Intelligent Label Cartridge, in violation of 35 U.S.C. § 271.

76.     Each Defendant also infringes under 35 U.S.C. § 271(b) and (c) by inducing and/or contributing to infringement of the '791 Patent in the State of New York, literally or under the doctrine of equivalents, in this judicial district, and elsewhere in the United States, by, among other things, performing certain steps of the methods and systems claimed by the '791 Patent, and advising, encouraging, contributing, or otherwise inducing others to perform the remaining steps claimed by the '791 Patent to the injury of Sanford.

77.     Each of the Defendants, as the original owner or affiliate of the original assignee of the '791 Patent has had knowledge of the '791 Patent since its filing and issue date, and by

continuing the actions described above, has had specific intent to induce infringement of the '791 Patent pursuant to 35 U.S.C. § 271(b).

78.     Each of the Defendants is willfully and intentionally infringing the '791 Patent without authority and/or license from Sanford. Each Defendant's infringement of Plaintiff's exclusive rights under the '791 Patent will continue to damage Plaintiff, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

79.     Sanford is entitled to recover from each Defendant the damages sustained as a result of each Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT FIVE**
**WILLFUL INFRINGEMENT OF U.S. PATENT NO. 7,990,567**

80.     Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

81.     U.S. Patent Number 7,990,567 ("the '567 Patent") is entitled "Label Printer." The '567 Patent was duly and legally issued on August 2, 2011 by the United States Patent and Trademark Office. The '567 Patent is a continuation of U.S. patent application No. 10/436,363 that was sold to Newell via the SPA. A true and correct copy of the '567 Patent is attached hereto as Exhibit 6.

82.     DYMO is the owner of the '567 Patent. Sanford is the exclusive licensee of the '567 Patent and possesses all rights of recovery under the '567 Patent, including the exclusive right to sue for infringement and recover past damages.

83.     The '567 Patent provides, among other things, "a method for printing an image on an image receiving medium comprising the steps of inputting the image to be printed; printing

17

the image on the image receiving medium; storing a plurality of images, such that each time an image is printed said image is stored; and recalling one of said stored images, wherein the method further comprises one of editing and reprinting said recalled stored image."

84.     Each Defendant has infringed one or more claims of the '567 Patent, and continues to infringe, contribute to infringement of, and/or induce infringement of the '567 Patent, by making, using, selling, offering for sale, and/or importing the Leitz Icon Printer and its Intelligent Label Cartridge, in violation of 35 U.S.C. § 271.

85.     Each Defendant also infringes under 35 U.S.C. § 271(b) and (c) by inducing and/or contributing to infringement of the '567 Patent in the State of New York, literally or under the doctrine of equivalents, in this judicial district, and elsewhere in the United States, by, among other things, performing certain steps of the methods and systems claimed by the '567 Patent, and advising, encouraging, contributing, or otherwise inducing others to perform the remaining steps claimed by the '567 Patent to the injury of DYMO and Sanford.

86.     Each of the Defendants, as the original owner or affiliate of the original assignee of the parent application to the '567 Patent has had knowledge of the '567 Patent since its filing and issue date, and by continuing the actions described above, has had specific intent to induce infringement of the '567 Patent pursuant to 35 U.S.C. § 271(b).

87.     Each of the Defendants is willfully and intentionally infringing the '567 Patent without authority and/or license from Plaintiffs DYMO and Sanford. Each Defendant's infringement of DYMO and Sanford's exclusive rights under the '567 Patent will continue to damage Plaintiffs DYMO and Sanford, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

88.     Plaintiffs DYMO and Sanford are entitled to recover from each Defendant the damages sustained as a result of each Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT SIX
## BREACH OF CONTRACT BY ESSELTE

89.     Plaintiffs reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

90.     Esselte AB specifically conveyed the Companies' "Intellectual Property" from Esselte AB to Newell.

91.     The SPA defines "Intellectual Property" as "all U.S. and foreign (i) patents, patent applications, utility models, industrial designs, patent disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ('Patents') … (vi) all rights in the foregoing and (vii) all applications and registrations for the foregoing." (SPA §9.1(jj).)

92.     Annex 1 of the SPA's Disclosure Schedule lists the issued patents and applications conveyed in the SPA. (SPA §3.23(a)(1).) Annex 1 includes U.S. Patent Numbers 5,826,995, 6,152,623, and 6,890,113, and U.S. Patent Application Numbers 10/975,409 (which later issued as U.S. Patent Number 7,140,791) and 10/436,363 (which later issued as U.S. Patent Number 7,616,338, the continuation of which is U.S. Patent Number 7,990,567).

93.     Article III of the SPA is entitled "Representations and Warranties of the Seller."

94.     The SPA represents and warrants that the "Company or Subsidiary owns, or has sufficient valid right to use, free and clear of all Encumbrances other than Permitted Liens, all Intellectual Property necessary to conduct the Business." (SPA §3.23(b)(1).)

95.     Plaintiffs relied upon the representations and warranties within the SPA. Plaintiffs expended monies and resources in prosecuting and maintaining the patent applications and patents conveyed.   Plaintiffs used the Asserted Patents within their business and implemented the Asserted Patents within their products. The Asserted Patents were and are necessary to conduct the Business acquired under the SPA by Newell Rubbermaid, Inc. and operated by DYMO and Sanford.

96.     Esselte AB has control or direction over Esselte Corporation and Esselte Leitz GmbH & Co., KG  and all entities were aware of, and bound by, the terms and conditions of the SPA. Esselte Corporation and Esselte Leitz GmbH & Co., KG  are each affiliates of Esselte AB.

97.     Esselte Corporation has averred that one or more of the Asserted Patents are invalid in its Answer filed in this case on November 14, 2014.

98.     Esselte AB, Esselte Corporation and Esselte Leitz GmbH & Co., KG each caused to be filed an inter partes review challenging the validity of each of the '113, '791, '567 and '623 patents on February 19, 2015.  The inter partes review actions are PTAB-IPR2015-00781 (as to the '113 patent); PTAB-IPR2015-00766 (as to the '567 patent); PTAB-IPR2015-00771 (as to the '791 patent) and PTAB-IPR2015-00779 (as to the '623 patent).   In each action, Esselte Corporation, Esselte AB and Esselte Leitz GmbH & Co., KG each identified themselves as the real parties-in-interest.

99.     Defendants base their challenge to validity on prior art that was known to Defendants within three years of the Closing Date applicable to the SPA.  The Defendants each had unique and superior knowledge and expertise with such prior art and the field of label writing and printing technology.  At the time of the SPA, facts concerning the prior art and field of label writing and printing technology were not readily available to Plaintiff Newell-

Rubbermaid, which was entering into the SPA in part to acquire the deep patent portfolio being offered and as to which it relied upon Defendant Esselte AB's superior knowledge and experience.

100.    For example, Defendants challenge validity based on certain "AddressMate" software that one or more Defendants were knowledgeable of and had been using prior to filing of the '113, '791 and '567 patents.   Before the Closing, Defendants did not identify the AddressMate software as relevant to the respective patents whose validity it now challenges.

101.    Likewise, Defendants challenge validity based on material known to Defendants before the Closing Date but never identified as relevant.   At the time of the SPA, Defendants had unique and superior knowledge and expertise with the particular field of label printing art.   For the '791 patent, Defendants challenge validity based on U.S. Patent Nos. 5,314,256, 5,253,334 and 5,253,334, each of which was known to one or more Defendants before the Closing Date, but was not identified by Defendants as relevant to the '791 patent.   For the '623 patent, the U.S. Patent No. 5,424,757 to Thom ("Thom patent") had been cited against the '623 patent during prosecution, but the '623 patent was allowed over the Thom patent.   Yet Defendants now challenge validity based on knowledge of ordinary workers in the field at the time of the '623 patented invention in combination with the Thom patent.   Plaintiff Newell Rubbermaid was not active in the field of label printers at that time and, accordingly lacked Defendants' superior knowledge and expertise.

102.    Defendants have breached the SPA.   The breach is an obvious breach and Plaintiffs are entitled to injunctive relief and have sustained damages, including costs and attorney's fees, caused by Defendants' breaches of the SPA.

## COUNT SEVEN
## BREACH OF CONTRACT BY ESSELTE

103.   Plaintiffs reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

104.   The SPA at Section 10.8 specifies that "in the event any dispute arises out of this Agreement or any of the Transactions," each party "consents to submit itself to the personal jurisdiction of any federal court located in the State of New York" and "agrees that it shall not bring any action relating to the Agreement or any of the Transactions in any court other than a federal or state court sitting in the State of New York."

105.   The SPA at Section § 9.1(ooo) specifies that "'Transactions' shall mean all the transactions provided for or contemplated by this Agreement." The Transactions provided for or contemplated by the SPA include transfer of the Asserted Patents.

106.   Defendants' challenge to the validity of the Asserted Patents is related to or arises out of the Agreement or the Transactions.

107.   Defendants have, nonetheless, initiated an action in the Patent Trial and Appeal Board challenging the validity of the '113, '791, '567 and '623 patents. Defendants initiation of an action challenging the validity of those patents in the Patent Trial and Appeal Board is a direct and obvious breach of the SPA. Plaintiffs are entitled to injunctive relief and have sustained damages, including costs and attorney's fees incurred in addressing Defendants challenges to validity, caused by Defendants' breaches of the SPA.

## COUNT EIGHT
## TORTIOUS INTERFERENCE WITH ASSIGNMENT AGREEMENT

108.   Plaintiffs reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

109.     Each of Defendants were aware of the assignment agreement attached as Exhibit 8 to the original Complaint filed on September 19, 2014 by which Mr. Block assigned all right, title and interest in the '113 Patent.   Additionally, Defendant Esselte AB was aware of the assignment agreement by virtue of the SPA.

110.     Each Defendant was aware that Plaintiff DYMO is the successor in interest in the assignment agreement and that Plaintiff Sanford, as the exclusive licensee of the '113 patent, is a beneficiary of the assignment agreement.

111.     The assignment agreement provides that Mr. Block: "further covenant[s] and agree[s] that I will communicate to the said ASSIGNEE, its successors, legal representatives and assigns, any facts known to me respecting said invention, and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing, reissue and foreign applications, make all rightful oaths and generally do everything possible to aid the said ASSIGNEE, its successors, legal representatives and assigns, to obtain and enforce proper protection for said invention in all countries."

112.     Defendants persuaded Mr. Block to provide testimony challenging the validity of the '113 patent, specifically concerning Mr. Block's development and ownership of certain AddressMate software.   Mr. Block's testimony was in violation and breach of his covenant and agreement set forth in Exhibit 8.

113.     Defendants' interference with the agreement between Mr. Block and Plaintiffs DYMO and Sanford was both intentional and improper.

114.     First, Defendants intentionally sought to procure the testimony from Mr. Block in an effort to challenge the validity of the '113 patent.   For example, in the PTAB-IPR2015-00781 action that applies to the '113 patent, Defendants relied upon excerpted portions of Mr. Block's

declaration testimony in this matter, as well as documents and other evidence concerning AddressMate.

115.   Second, Defendants interference was also improper.   Defendant Esselte Corporation originally claimed to be procuring Mr. Block's testimony in an effort to support its noninfringement defense.   That claim was intentionally misleading.   Defendant Esselte Corporation, as well as Defendants Esselte AB and Esselte Leitz GmbH & Co., KG  each procured Mr. Block's testimony in order to provide same to (1) their invalidity experts, Mr. Roman and Mr. Stephen Gray (who testified in connection with the actions filed by Defendants with the Patent Trial and Appeal Board) and (2) the Patent Trial and Appeal Board in support of the action Defendants filed that directly challenges the validity of the '113 patent.

116.   However, as Mr. Block explained and testified in open court on February 24, 2015, Mr. Block did not believe that the testimony he gave was for the purpose of showing invalidity.   Mr. Block further testified that he did not understand that Esselte was claiming that the '113 patent was invalid in view of AddressMate or that Mr. Roman was being provided Mr. Block's materials and testimony on AddressMate so as to support Mr. Roman's testimony on validity of the '113 patent.   Accordingly, Defendants intentionally misled Mr. Block so as to secure his supporting testimony to challenge validity of the '113 patent.

117.   Plaintiffs DYMO and Sanford have been damaged by Defendants' improper and intentional interference with their agreement with Mr. Block.   Plaintiffs DYMO and Sanford have been, and will continue to be, forced to incur costs and fees in connection with addressing the PTAB-IPR2015-00781 action.   Further, Plaintiffs DYMO and Sanford have been damaged by the improper efforts Defendants have utilized to cast doubt upon the presumed validity of the

'113 patent.  Plaintiffs DYMO and Sanford are accordingly entitled to injunctive relief and damages.

## COUNT NINE
## BREACH OF CONTRACT BY BLOCK

118.   Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

119.   Mr. Block served as DYMO's Vice President of R&D and Technology from 2005 until 2011.  During that time, Mr. Block had access to DYMO's confidential information and trade secrets. **REDACTED**

120. **REDACTED**

121.   DYMO and Mr. Block executed a Separation Agreement (the "Separation Agreement") on January 2, 2011, which included an agreement not to disclose trade secrets and confidential information.  A true and correct copy of the Separation Agreement is attached as Exhibit 9 to this Amended Complaint.

122.   In the Separation Agreement, Block agreed to "protect and hold in strict confidence all Company Information, as that term is defined below, that you have received or created on behalf of the Company and that you will not, directly or indirectly, use, publish, disseminate or otherwise disclose any Company Information to any third party without the Company's prior written consent, unless and until such time as the restrictions on your use or disclosure of such Company Information expire as set forth herein below."

25

123.    The Separation Agreement signed by Mr. Block states that "Company Information" means "'Confidential Information' and 'Trade Secrets.'"    The Separation Agreement provides that "The restrictions on your use or disclosure of all Company Information, as set forth above, shall survive for a period of three years" and that "restrictions on the use or disclosure of Trade Secrets shall survive beyond such three year period for so long as such information qualifies as a Trade Secret under applicable law."

124.    Mr. Block's employment with Newell was terminated on March 31, 2011.

125.    Less than a year later, in February 2012, Mr. Block was contacted by Phillip Damiano informing him that Esselte was investigating an opportunity to re-enter the label printing business and inviting Mr. Block  to assist.  Beginning in the spring of 2012, Mr. Block participated in developing plans to introduce a new label printing product on behalf of Esselte.

126.    Mr. Block and Esselte entered into a consulting agreement sometime in April, 2012.  Mr. Block worked with a consultant, the Ken Miller Group, based in New York, New York, that Esselte hired to test various concepts for a new label printer.  Mr. Block supplied many of the concepts tested, either alone or in conjunction with Mr. Damiano.  Mr. Block also participated in the market studies conducted in New York over several days in approximately May, 2012 to explore user reaction to the concepts tested, many of which were based upon DYMO's confidential information.

127.    In July 2012, Mr. Block was officially hired by Esselte Corp. as Vice President of Product Development.  Since that time, he has continued to work on the design, development, and eventual launch of the Leitz Icon Printer, the Leitz Intelligent Label Cartridges, and the Leitz Icon Software.

128.     The Leitz Icon includes many of the features discussed in DYMO's proprietary and confidential design plans, ███████████ REDACTED ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ .

129.     In his work with and on behalf of Esselte and in violation of his Separation Agreement, Mr. Block has disclosed, used, and/or relied upon DYMO's confidential information and/or trade secrets, ███████████ REDACTED ███████████

███████ , on behalf and for the benefit of Esselte, a direct competitor of DYMO.

130.     Mr. Block has breached one or more of his obligations under the Separation Agreement by using and/or disclosing Plaintiffs' confidential information and/or trade secrets to third parties prior to March 31, 2014.

131.     Plaintiffs DYMO and Sanford have sustained damages caused by Mr. Block's breach of the Separation Agreement and are entitled to injunctive relief.

## COUNT TEN
## TORTIOUS INTERFERENCE WITH CONTRACT BY ESSELTE

132.     Plaintiffs DYMO and Sanford reallege and incorporate by reference the allegations included in the foregoing paragraphs as if fully set forth herein.

133.     When Mr. Damiano's employment terminated, he executed an employment agreement that included obligations of confidentiality, a true and correct copy of which is

attached as Exhibit 10.  Mr. Damiano was, accordingly, aware that Plaintiff DYMO had taken steps to ensure confidentiality of their confidential and/or trade secret information.

134.     Additionally, at the time of the separation of at least former DYMO employees Kris Vandermeulen, and Tom De Fruytier, Plaintiff DYMO executed separation agreements containing nondisclosure provisions providing that those employees would not use or disclose, either directly or indirectly, DYMO's trade secrets or confidential information.

135.     Each of the Defendants were aware of DYMO's practice of protecting its confidential and trade secret information and of the former DYMO employees' obligations of confidentiality such as exemplified in Exhibits 9 and 10.  Each of the Defendants were aware that Plaintiff Sanford had the exclusive right to practice DYMO's trade secrets within the United States.

136.     Defendants nonetheless engaged Mr. Damiano to develop new business in the label printing market and Mr. Damiano acted as Defendants' agents in doing so.  Mr. Damiano, with Esselte's knowledge, thereafter recruited at least Mr. Block in an effort to develop a label printer product for Esselte.  As a result, at least each of Mr. Block and Mr. Damiano violated their agreements requiring them to not directly or indirectly use or disclose DYMO's confidential or trade secret information.

137.     Defendants' interference with the agreement between Plaintiff DYMO and one or more of DYMO's former employees was both intentional and improper.

138.     First, Defendant Esselte was aware of, and approved, Mr. Damiano's plans by virtue of at least a January, 2012 presentation provided to its management.  Defendants intentionally sought to procure at least Mr. Damiano and Mr. Block's assistance in identifying marketable and new concepts to implement in a new label printer product.  Defendants were

aware of Mr. Block's prior work and experience with Plaintiffs DYMO and Sanford.  Rather than shielding Mr. Damiano or Mr. Block from work on a label printer that might result in disclosure of confidential or trade secret information of Plaintiffs DYMO and Sanford, Defendants engaged Mr. Block to develop and supervise implementation of concepts, features and architecture for a new label printer entry to the market,

139.   Second, Defendants interference was also improper.  Defendants were aware of former DYMO employees' confidentiality obligations, but nonetheless relied on at least Mr. Block and/or Mr. Damiano to identify, implement, develop and supervise Defendants' creation of the Leitz Icon printer and software.

140.   Plaintiffs DYMO and Sanford have been damaged by Defendants' improper and intentional interference with its agreements with DYMO's former employees.  Defendants' hiring of former DYMO employees and assignment of those employees to develop, market and sell the Leitz Icon printer with the use, either directly or indirectly, of DYMO and Sanford's trade secrets and/or confidential information is the proximate cause of DYMO and Sanford's damages

141.   Plaintiffs DYMO and Sanford are accordingly entitled to injunctive relief and damages.

## JURY DEMAND

142.   Plaintiffs hereby request a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

143.   Plaintiffs respectfully request that the Court find in their favor and against the Defendants, and that the Court grant Plaintiffs the following relief:

29

A. A judgment in favor of Plaintiffs that Defendants have infringed one or more of the claims, directly, jointly and/or indirectly, by way of inducing and/or contributing to the infringement of each of the Asserted Patents;

B. A preliminary and/or permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants and their officers, directors, agents servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement, inducing the infringement of, or contributing to the infringement of U.S. Patent Nos. 6,152,623, 6,890,113, 7,140,791, and/or 7,990,567, or such other equitable relief the Court determines is warranted;

C. An award to Plaintiffs of damages adequate to compensate Plaintiffs for the Defendants' acts of infringement, breach of contract and tortious interference with contractual relations together with pre-judgment and post-judgment interest;

D. That the Court find Defendants' acts of infringement willful and award treble damages for such willful infringement pursuant to 35 U.S.C. § 284;

E. That this Court declare this to be an exceptional case and award Plaintiffs their reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285;

F. That this Court declare that Defendants' breach of the SPA are "obvious" breaches that entitle Plaintiffs to their reasonable attorney's fees and costs; and

G. That this Court award compensatory damages resulting from Mr. Block's breaches of his contractual confidentiality and/or trade secret obligations;

H. That this Court issue an injunction enjoining Defendants' unauthorized use of DYMO and Sanford's confidential information and/or trade secrets;

I. That this Court award Plaintiffs' DYMO and Sanford compensatory and punitive damages resulting from Defendants' intentional interference with contractual relations; and

J. Any further relief that this Court deems just and proper.

DATED: March 6, 2015                          Respectfully submitted,

                                              KILPATRICK TOWNSEND & STOCKTON LLP

                                              By: _____

                                              Frederick L. Whitmer (FW-8888)

                                              The Grace Building
                                              1114 Avenue of the Americas
                                              New York, NY, USA 10036-7703
                                              Telephone: (212) 775 8700
                                              Facsimile: (212) 775 8800

                                              Wab Kadaba (Georgia Bar No. 405727)
                                              Mitch Stockwell (Georgia Bar No. 682912)
                                              Richard Goldstucker (Georgia Bar No. 940472)

                                              1100 Peachtree Street, Suite 2800
                                              Atlanta, GA  30309-4530
                                              Telephone: (404) 815-6500
                                              Facsimile: (404) 815-6555

                                              *Attorneys for Plaintiffs*